JS 44 (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Realm Management, LLC

### DEFENDANTS

AGCS Marine Insurance Company

**(b)** County of Residence of First Listed Plaintiff   **Dallas County, Texas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **New York County, NY**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Danny Ray Scott
Scott Law Offices, P.C.
708 Main Street
Houston, Texas 77002
(713) 941-9309

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 871 IRS—Third Party 26 USC 7609 | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(a)(1)

Brief description of cause:
First-Party Property Insurance Claim Dispute

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REALM MANAGEMENT, LLC, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. 3:21-CV-21-2559 |
| | § | |
| v. | § | |
| | § | |
| AGCS MARINE INSURANCE COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1.      Plaintiff, Realm Management, LLC ("Realm Management"), is a limited liability company whose business address is 1301 South Shiloh Road, Garland, Texas 75042. Plaintiff's members are Sona Ralhan, whose state of citizenship is Texas, and Danny Ralhan, whose state of citizenship is Texas.

2.      Defendant, AGCS Marine Insurance Company, is a corporation that is incorporated under the laws of the State of Illinois.  Defendant has its principal place of business in the State of New York.  Defendant may be served with process by serving its agent for service of process, C T Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## JURISDICTION

3.     The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

## VENUE

4.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

## D. CONDITIONS PRECEDENT

5.     All conditions precedent has been performed or have occurred.

## FACTS

6.     Plaintiff is the owner of a commercial property insurance policy, policy number MXI-93084167, issued by the defendant (hereinafter referred to as the "policy").

7.     Plaintiff owned the insured property that is specifically located at 1111 & 1113 South Shiloh Road, Garland, Texas 75042 (hereinafter referred to as the "property").

8.     Defendant or its agent sold the insurance policy to plaintiff.

9.     On or about October 20, 2019, plaintiff's property sustained windstorm damage. Plaintiff submitted a claim to AGCS against the policy for damage caused to the property because of the wind. Plaintiff asked AGCS to cover the cost of repairs to the property pursuant to the policy and any other available coverages under the policy.  AGCS assigned claim number 40053822 to plaintiff's claim.

10.   The storm caused significant damage to the roof, including damage to the roofing membrane system, perlite board, roofing underlayment, roofing bitumen, and central air condenser.

11.   AGCS's unreasonable investigation of the claim included a failure to comply with construction industry standards concerning roof inspections and when to replace or repair a roof. The roof required full replacement.  AGCS performed an unreasonable investigation by failing to document all the damage to the roof.  AGCS did not conduct a thorough roof inspection and only allowed the minimum cost to repair the roof. As a result of AGCS's unreasonable and brief investigation, the insured was wrongly denied the full cost to replace the roof.

12.   AGCS performed an insufficient and unreasonable exterior investigation of the property.  The wind damaged the structure's walls and required that the walls be replaced, primed, and painted.  As a result of AGCS's unreasonable investigation, the insured was wrongly denied the full cost to repair all the exterior damage.

13.   AGCS performed insufficient and unreasonable roofing and exterior investigations of the insured property.  As a result, AGCS missed significant roofing and exterior damages to the insured property.  AGCS conducted an insufficient inspection and prematurely closed the insured's claim.  At the time of the investigation, premature closing of claims was part of a pattern and practice of claims handling by AGCS.

14.     AGCS failed to properly adjust the claim and defendant has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses such as those suffered by the insured.  Furthermore, AGCS underpaid portions of the insured's claims by not providing full coverage for the damages sustained by the insured, as well as under-scoping the damages during its investigation.  Defendant had no reasonable basis to deny any portion of plaintiff's claim.

15.     To date, AGCS continues to delay in the payment for the damages to the property.  As such, the insured's claim(s) remain unpaid, and the insured still has not been able to properly repair the property.

### THE CASUALTY INSURANCE SYSTEM

16.     The casualty insurance industry is one in which policyholders are forced to buy an unseen, but socially essential, financial product "on faith" from insurers who market their product with promises of prompt and full protection.[1]  The indemnity principle of insurance expresses the casualty insurer's traditional duty to provide full restitution of covered casualty losses in order to preserve its insureds' standard of living or operating standards.[2]  Under the fiduciary principle, "an insurance company holds funds of its

---

[1] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 42 (2nd ed. Trial Guides, LLC, 2008).
[2] *See* Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 218, (3rd ed. Barron's 1995), hereinafter referred to as "Rubin."

insureds (the payment of premiums) in trust, and through an 'insuring agreement' promises to make *all benefit payments for which it has received premiums*."[3]

**THE ROLE OF INSURANCE UNDERWRITING**

17.   Underwriting is the process of (1) deciding which accounts are acceptable, (2) determining the premiums to be charged and the terms and conditions of the insurance contract, and (3) monitoring those decisions.[4]  Underwriting is what insurers do to be financially successful.[5]  Although insurers include other specialty departments such as actuarial, claims, and marketing, all insurer activities follow from corporate underwriting decisions.[6]  The purpose of underwriting is to ensure that the risk transfer is equitable and the insurer is able to develop and maintain a growing, profitable book of business.[7]

18.   The law of large numbers helps insurers predict the number of losses they will pay in any given time period so that they can determine what premium is required to pay those losses.[8]  The law of large numbers enables insurers to offer large dollar amounts of coverage for much less money in return.[9]  Insurers underwrite a large number of similar risks and predict the dollar amount of all the losses that those insureds are

---

[3] *Id* at 167.
[4] Joseph F. Mangan, CPCU and Connor M. Harrison, CPCU, AU, *Underwriting Principles* at p. 1 (2nd ed. The Institutes 2010), hereinafter referred to as "Mangan."
[5] *Id*.
[6] *Id*.
[7] *Id*. at 2. ("Book of Business" is insurance industry terminology that refers to the collection of all the policies written by an insurer.  Although the term can have various meanings, this text will use it to refer to all of an insurer's policies).
[8] James Markham, Kevin M. Quinley, and Layne S. Thompson, *The Claims Environment*, at 1.2 (Malvern, Pa.: IIA, 1993), hereinafter referred to as "Markham."
[9] *Id*.

expected to experience.[10]  Premiums are based on each insured's share of the predicted losses plus the insurer's expenses and an allowance for profit.[11]

19.   Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in the rates.[12]  If underwriters accept risks that experience more losses than anticipated, then the rates will be inadequate and the insurer's solvency might be threatened.[13]  Actuaries predict the number of losses that will occur and the amount of money that insurers will pay in claims to develop rates for insurance.[14]  The claim department provides the raw data, such as number of claims, claim payments, and reserve amounts, that actuaries analyze through complex mathematical methods.[15]  Actuaries use this actual claims data in predicting the number of losses that will occur and the amount of money that insurers will pay in claims.[16]  Insurers then use this information to set premium rates that will enable the insurers to pay the predicted amount of policyholder claims, pay the insurers' expenses, and make a reasonable profit/surplus.[17]  Insurance companies could not provide this valuable service unless they were able to make a legitimate profit sufficient to allow them

---

[10] *Id.*
[11] *Id.*
[12] *Id* at 1.13.
[13] *Id.*
[14] *Id.* at 1.15.
[15] *Id.*
[16] *See* Markham, at 1.15.
[17] *Id.* at 1.2.

to remain solvent and provide a reasonable return to their shareholders/stakeholders.[18] Premiums are already calculated to allow insurers to accomplish both of those goals.[19]

20.    Casualty insurance is designed to pay the full cost of the property casualty losses suffered in a covered event.[20]  Under the indemnity principle, the "objective [of casualty insurance] is to restore the insured to the same financial position after the loss that he or she was in prior to the loss."[21]  When casualty insurance works properly, it achieves this socially vital objective – and our lives can proceed relatively unimpaired by the financial hardship of an unexpected casualty loss.[22]  When casualty insurance fails and leaves us in a worse financial position after a covered loss, the indemnity principle is defeated, and we all suffer the consequences.[23]  In the claim at hand, the defendant insurer set its premium rates in a manner that failed to provide it with sufficient claim trust funds to pay the anticipated loss for plaintiff's claim and for the other insureds' claims in its book of business.  The defendant's failure to adequately set its premium rates caused defendant to deny full payment for plaintiff's claim.

---

[18] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 36 (2nd ed. Trial Guides, LLC, 2008), hereinafter referred to as "Berardinelli."
[19] *See* Markham, at 1.2.
[20] *See* Berardinelli, at 7.
[21] *See* Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 218 (3rd ed. Barron's 1995).
[22] *See* Berardinelli, at 7.
[23] *Id*.

## HOW INSURANCE PREMIUMS ARE CALCULATED

21.    The primary building block of casualty premiums is called "loss costs."[24]  Loss costs are the insurer's good faith projection of how much it will pay for legitimate claims during a given policy period.  Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers."[25]  Loss costs make up generally about seventy cents ($0.70) of every premium dollar we pay for property-casualty coverages.[26]

22.    Insurers charge their policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.[27]  Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for the insurer's profit.[28]  In addition, the insurer's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten

---

[24] Also called "loss trends."  *See* Rubin, at 278, Footnote 1 on page 7, *supra; Id.*, at 278, 384.

[25] "In a statistical context, 'law of large numbers' implies that the average of a random sample from a large population is likely to be close to the mean of the whole population."  *See* Wikipedia Encyclopedia, http://en.wikipedia.org/wiki/Law_of_large_numbers.

[26] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.

[27] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.

[28] *See* Berardinelli, at 19.

cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.[29]

23.   The seventy cents ($0.70) of the policy dollar is the part of the premium fund designated to pay policyholder claims.[30]  If the insurer's promise to pay claims is the product we are buying, then the insurer's projection of loss costs is like that statement on the product label describing important details of the product to the customer.[31] Policyholders do not want to pay for more losses than the insurer is actually going to pay – just as consumers do not want to pay for more of a product than they are actually going to receive from their purchase.[32]

24.   Policyholders expect insurers to design their "claim payment factory" to generate a product that meets the expectations created by the promises the insurers make on the label of every product it sells, i.e., … the insurance policy.[33]  Policyholders' most important expectations are full indemnification and peace of mind – the security of knowing covered casualty losses will be restored promptly and fairly, without being forced through a lot of needless adversarial hoops.[34]  Policyholders do not expect the insurance product to be designed so that only experts, attorneys, and insurance professionals can figure out how to obtain its promised benefits.[35]  Rather, policyholders

---

[29] *Id.*
[30] *Id* at 20.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] See *Zilisch v. State Farm Mutual Insurance Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000).
[35] *See* Berardinelli, at 20-21.

expect to be able to receive the benefits of their insurance policies themselves without a lot of difficulty and delay and without professional help.[36]

### THE ROLE OF THE CLAIMS ADJUSTER

25.   Claims are handled well when insurance companies pay what they owe, promptly and without muss or fuss.[37]  When claims departments become transformed into profit centers and the job of claims adjuster is redesigned to be a contributor to corporate profits, however, how claims departments work affects how well they work.[38] With a new, systematic approach to the claims process, claims departments work well for the insurance companies but sometimes not so well for those who rely on them.[39]

26.   As late as the 1970's, most insurance adjusters exercised a great deal of discretion.[40]  The adjuster saw his job as settling claims for a fair amount.[41]  The common understanding was "we close the case out with everybody happy" by paying "what the claim is worth."[42]  Insurance companies were not in business to "chisel" the public.[43]  If the insurance company knew the claim was worth $20,000, then the insurance company paid $20,000.[44]

---

[36] *Id*. at 21.
[37] Feinman, Jay M., *Delay, Deny, Defend: Why Insurance Companies Don't Pay Claims and What You Can Do About It*, at 86 (1st ed. Penguin Group 2010), hereinafter referred to as "Feinman."
[38] *Id*.
[39] *Id*.
[40] *Id*. at 87.
[41] *Id*.
[42] H. Laurence Ross, *Settled Out of Court: The Social Process of Insurance Claims Adjustments* (Chicago: Aldine, 1970), 46-54.
[43] *See* Feinman, at 87.
[44] *Id*.

27.    The claims adjuster whose job demands brains, integrity, and guts is now much less in evidence, because most adjusters are more closely bound to office and computer and are subject to elaborate systems that direct their work.[45]  Today's adjuster is less an advocate for fair treatment of the consumer, because adjusters are often required to conform to the demands of the claim-processing system and are evaluated on their conformity to the system, including, explicitly or implicitly, on the amount paid out, or not paid out, in claims.[46]  The key to the claim process is the system, not the adjuster.[47]  A highly organized, industrialized system for processing claims is the key to modern insurance adjusting.[48]  The model is the shift from individual craftsman as jack-of-all-trades to specialized production in which each worker in a factory produces a single product, over and over.[49]  Because the adjuster has less discretion, he needs less training, and the training that is provided is focused on applying the system.[50]  More than a third of insurance companies provide new adjusters with two to four weeks of training, and one out of eight companies provide less than a week of training or no training at all.[51] The knowledge that is needed for processing claims is built into the system and therefore does not have to be held by the adjuster.[52]  Adjusters have become less independent and

---

[45] *See* Feinman, at 87.
[46] *Id*.
[47] *Id*. at 88.
[48] *Id*.
[49] *Id*. at 89.
[50] *Id*.
[51] R. Jones, Ira Blatt, and Thomas G. Barger, "Keeping Customers and Employees Happy: Claims Best Practices," *Claims* (October 2001), 50.
[52] *See* Feinman, at 90.

more efficient from the company's point of view, with efficiency defined in terms of following the dictates of the claims systems.[53]  The systems dictate process and results, and adjusters are evaluated on their adherence to the system.[54]  The adjuster's new role, therefore, is less to be an experienced professional making an individual evaluation of each claim and more a clerk executing the demands of the system.[55]  From the company's and the adjuster's perspective, this makes each claim much like every other claim, which generates efficient and predictable results.[56]  From the policyholder's perspective, of course, that is not the point of the insurance policy; the point of the insurance policy is prompt and fair processing of a unique loss.[57]  In the case at hand, the defendant evaluated plaintiff's claim in an outcome oriented fashion according to the defendant's predetermined goals for its claims handling system, and failed to evaluate plaintiff's claim according to the unique characteristics of the claim.  This type of claim evaluation caused defendant to wrongly deny all or part of plaintiff's claim.

28.    The most widely information system in property casualty insurance adjusting is Xactimate®, which estimates the cost of repairs to damaged homes and other property.[58] Xactimate® is software for estimating the extent of a loss and the cost of repairs that

---

[53] James Mathis, "Efficient or Malicious," United Policyholders Website, May 2008, www.unitedpolicyholders.org/e_news/May08/article_Auto.html.
[54] *See* Feinman, at 91.
[55] *Id*.
[56] *Id*.
[57] *Id*.
[58] *Id*. at 92.

presumes to be exact.[59]  A property loss adjuster takes his Xactimate®-loaded laptop and

measures, records and lists information about the damaged property, and the program

produces a dollar amount that will be the basis of the insurance company's payment of a

claim.[60]  Xactimate® works off choices made by the adjuster, and because it needs to cover

many different situations, the program is designed to give the adjuster a wide range of

choices.[61]  Each of these choices affects the repair estimate.  When drywall is replaced, the

new drywall needs to be painted; the adjuster must choose the appropriate application –

seal/prime, seal then paint, paint one coat, or paint two coats – each of which will produce

a different cost estimate.[62]  If a large area of drywall needs to be replaced, the adjuster

may or may not decide the furniture and other contents need to be removed to allow for

work space and to protect the contents; that can be accounted for as labor and contents

manipulation, with the adjuster adding a variable for the time needed or the size of the

room as small, medium, or large.[63]  In the case at hand, the defendant manipulated

Xactimate® in a manner that led to the improper denial of all or part of the claim at issue

in this lawsuit.

29.  If Xactimate® was actually exact, it would benefit insurance companies and

policyholders alike.[64]  Unfortunately, Xactimate® permits considerable error by adjusters

---

[59] *Id*. at 93.
[60] *Id*.
[61] *Id*. at 168.
[62] *Id*.
[63] *Id*.
[64] *Id* at 93.

and is subject to manipulation by insurance companies.[65]  Xactimate® is a tool and, like any other tool, it is neither perfect nor impervious to misuse.[66]  It first depends on an accurate scope of the work and, as with any program, the concept of "garbage in, garbage out" applies.[67]  Any errors in scope will produce an inaccurate estimate.[68]  Like other elements of the systematic approach to claims processing, Xactimate® might favor efficiency and profits at the expense of accuracy and fairness.[69]  In the case at hand, the defendant's adjusters committed considerable error in their use of Xactimate® and manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

30.    The adjuster's job is to honor the company's promise to pay what is owed, no more but no less.[70]  Whether and how much an adjuster pays in a particular case or all cases should depend only on how much the company owes on claims.[71]  If the adjuster's pay, or the adjuster's status as a third-party vendor, is tied to reducing claim payouts or on closing cases without payment, then the insurance company has given the adjuster an incentive to violate accepted practices and break the promise the company made to its policyholders.[72]  In the case at hand, the defendant provided positive and/or negative

---

[65] *Id.*
[66] *Id.* at 167.
[67] *Id.* at 144.
[68] *Id.* at 167.
[69] *Id.* at 93.
[70] *Id.* at 94.
[71] *Id.*
[72] *Id.* at 95.

incentives to its adjusters that caused defendant's adjusters to adjust the claim in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

31.   When a policyholder files a claim, the fundamental truth about the claim process should come into play: when a loss occurs that is within the coverage of the insurance policy, the policyholder has already paid for the loss.[73]  The risk has been defined, priced, transferred from the insured to the insurance company, and shared by the company among its policyholders and investors, so all that is legitimately left to be done is to pay the claim.[74]  From the policyholder's point of view, the covered event should now be risk free – that is, free of the risk that the company will fail to pay what it owes.[75]  The actuary's job is to evaluate risk characteristics, the underwriter's job is to evaluate potential insureds, and the executive's job is to manage the whole process, but the claims adjuster's only job is to decide if a loss falls within the policy, determine the extent of the loss, and pay the claim.[76]  In the case at hand, the policyholders of which AGCS's book of business was comprised paid the full value of plaintiff's loss.  However, AGCS intentionally and strategically failed to transfer those claim trust funds to plaintiff and instead retained those funds as profit.  AGCS's wrongful actions led to the improper denial of plaintiff's claim.

---

[73] *Id.* at 25.
[74] *Id.*
[75] *Id.*
[76] *Id.*

INSURANCE COMPANIES' USE OF LITIGATION

32.    "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer."[77]  As stated previously, insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates for their books of business.[78]  However, insurance companies have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments into profit centers.[79]  McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world."[80]  It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and pharmaceutical concerns."[81]  McKinsey's clients pay from $10 million to $60 million per year for advice on how to manage their business operations to increase profitability.[82]  McKinsey & Company acted as a leader in formulating a new insurance strategy to convert insurance claim departments into efficient profit centers.  Many of the world's

---

[77] *Hayseeds, Inc. v. State Farm Fire & Casualty*, 352 S.E.2d 73, 79 (W. Va. 1986).
[78] *See* Mangan, at 2.
[79] *See* Feinman, at 12.
[80] *See* Byrne, John, *Inside McKinsey*, BUSINESSWEEK-ONLINE, July 8, 2002, http://www.businessweek.com/magazine/content/02_27/b3790001.htm (accessed February 2006), hereinafter cited as "Byrne."
[81] *Id*. at Footnote 5 on page 10, *supra*.
[82] *Id*.

largest insurers hired McKinsey for this purpose.[83]  However, although every insurance company did not hire McKinsey directly and did not have a direct relationship with McKinsey, McKinsey's policies influenced the operations of the insurance industry as a whole because of the extraordinary results McKinsey achieved for the insurance companies that did retain McKinsey directly for its consulting services.  By 1992, McKinsey had already worked on several projects for insurance companies seeking to increase profits.  These included State Farm, Hartford, United Services Automobile Association (USAA), and possibly Nationwide, and Liberty Mutual as well.[84]  During the mid-1980's, USAA invited interested members of the insurance community to its home office in San Antonio for open discussions about McKinsey's redesign of its claim system.[85]  USAA credited McKinsey with "saving" the company and openly shared information about McKinsey's creation of USAA's new claims handling system.[86]

33.    In essence, the McKinsey strategy calls for insurance companies to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center.  A major goal of this strategy is to shift any advantage away from the insureds and plaintiff attorneys.[87]  As the first step in the

---

[83] *See* "The McKinsey Slides," at 12373-12386.
[84] *Id*.
[85] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 36 (2nd ed. Trial Guides, LLC, 2008).
[86] *See* Affidavit of Gary T. Fye, ¶ 20, *King v. AGCS Ins. Co.*, SF 97-3008(c), filed July 28, 1999.  Gary T. Fye is a nationally known claim handling expert who has testified in a number of cases nationwide regarding Allstate's CCPR program.  Mr. Fye testified in *Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d 1134, 1148 (Utah 2001). *See also* Rasiel, Ethan M., THE MCKINSEY WAY, at xi (McGraw-Hill 1999).  Mr. Raisel's book is based on his personal experiences as a McKinsey associate between 1989 and 1992.  *Id.*, at xiv.
[87] *See* "The McKinsey Slides," at 2929.

process, insurers reduce attorney representation levels by improving the initial customer service experience for its insureds.  Specifically, insurers make early contact with the insureds following a claim, promises fair treatment, and promises prompt payment.[88] During the claim investigation, insurers aggressively investigate only the facts which defeat the claim once attorney representation begins.[89]  Insurers then make "firm" [take-it-or-leave-it] settlement offers with no real negotiation.[90]  If the insured refuses to accept the "firm" offer, then the insurance company aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values.[91]  Essentially, policyholders who want "prompt" payment – meaning they are willing to give the insurance company a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give the insurance company a cut from their share of the claim trust fund – get "Boxing Gloves" treatment.[92]  No policyholder, however, would get both prompt *and* fair payment of a claim.[93]

34.    McKinsey implemented a litigation management system designed to enforce policyholder acceptance of its new claim system.  Under traditional casualty insurance

---

[88] *See* Berardinelli, at 90.
[89] *Id*.
[90] *Id*.
[91] *Id*.
[92] *Id*. at 95.
[93] *Id*.

thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm.[94] McKinsey saw litigation as providing the best possible venue for achieving the goals of its new system for casualty insurance.[95]  Litigation is costly and time consuming. It allows an insurer to fully exploit its overwhelming financial superiority and the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss.[96]  Litigation would also provide a means for McKinsey to send messages to other policyholders and plaintiff's attorneys about the futility of resistance to the new system.[97]

35.   In addition to these company-level procedures, McKinsey implemented an insurance company strategy that focused on societal, legislative, and commercial measures which all but ensured the success of the strategy.  McKinsey implemented a plan for insurance companies to lead national campaigns to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.[98]

---

[94] *Id*. at 124.
[95] *Id*.
[96] *Id*.
[97] *Id*.
[98] *See* "The McKinsey Slides," at 2929.

36.    Although defendant may not have hired McKinsey & Company directly to design defendant's claim handling system, defendant's claim handling factory incorporates the strategies and principles that McKinsey introduced to the insurance industry and defendant's claim factory operates in a manner that is identical to the system created by McKinsey.  Defendant's claim handling protocols, company goals, profit goals and claim handling strategy originate from the doctrine that was created, implemented, and shared with the insurance community by McKinsey.   Defendant's protocols, strategies, and procedures for handling first-party property insurance claims are closely aligned with and virtually matches the claims handling system created by McKinsey.  In the case at hand, defendant implemented a McKinsey based claim handling system to increase its profits at plaintiff's expense.

## INFORMATION LIKELY TO BE IN THE POSSESSION OF AGCS

37.    As with all bad faith cases, most of the proof of plaintiff's bad faith claim against AGCS will be uniquely and solely in AGCS's possession.  One of the ways in which AGCS achieved lowered claim payments was to adopt an aggressive strategy towards claims resulting from weather events.  Following these weather events, AGCS implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company.  If the policyholder accepts the denial, then AGCS retains all the money owed to the policyholder.   In essence, AGCS eliminates claims by issuing

sweeping denials under the presumption that some policyholders will accept the denial without question.  Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, face "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims.  In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are becoming increasingly unwilling to fight insurance companies.  Thus, AGCS not only frustrates policyholders' attempts to pursue their claim, but AGCS also sends a message to plaintiff's attorneys that filing suit against AGCS does not constitute an economically viable option.

38.    AGCS also creates an environment that encourages independent adjusters to underpay claims.  By tracking the average amount paid on claims for each adjuster, AGCS can determine which adjusters are keeping costs down.   AGCS therefore rewards independent adjusters by giving them additional business in exchange for minimizing AGCS's indemnity payout on claims.   This arrangement creates a conflict of interest between the independent adjusters and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest.  In this case, AGCS assigned an inadequately trained adjuster to inspect plaintiff's property and adjust plaintiff's claim.  In addition, the adjuster had a AGCS-provided financial incentive to deny all or part of plaintiff's claim.

39.   In the case at hand, AGCS denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns by ignoring the merits of plaintiff's claim.  To date, AGCS continues to delay in the payment for the damages to the property.  As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## COUNT 1 - BAD FAITH

40.   Plaintiff is an insured under an insurance contract issued by AGCS, which gave rise to a duty of good faith and fair dealing.

41.   Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

42.   Following its initial inspection, AGCS possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim.   In addition, following its initial inspection, AGCS failed to provide coverage for all the covered damage, including the damage that plaintiff's inspector discovered during his inspection.  AGCS failed to honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

43.   Defendant's breach of duty proximately caused injury to plaintiff, which resulted in the following damages:

a.   mental anguish damages; and

b.    loss of policy benefits.

44.   <u>Exemplary damages.</u>  Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual fraud, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### COUNT 2 - BREACH OF CONTRACT

45.   In addition to other counts, AGCS breached its contract with plaintiff.

46.   Plaintiff and defendant executed a valid and enforceable insurance contract.  The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

47.   Plaintiff fully performed plaintiff's contractual obligations.

48.   AGCS breached the contract by refusing to pay the full amount of the cost to repair or replace the property.  AGCS failed and refused to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

49.   In its handling of plaintiff's claim, AGCS employed the doctrine of "efficient breach."  By intentionally breaching the insurance contract, AGCS was able to retain the claim payment funds, keep those funds invested, and continue to earn income from the

investment of those funds.[99]  Even a few dollars held for a few days on each claim add up when the insurance company has thousands of claims each year.[100]  In addition, by denying plaintiff's claim, AGCS gave the insured a choice: Accept AGCS's claim decision or spend several years in litigation fighting AGCS to make it keep the promise of indemnity made to the insured.  AGCS is a professional defender of lawsuits.[101]  AGCS regularly employs litigation counsel, allocates resources to litigation, and defends lawsuits in the regular course of its business.  The insured is vulnerable and needs money to repair its property.  Delay increases the pressure on the insured to take whatever the insurance company offers so that the insured can meet its immediate financial needs and get on with its business.  The longer the delay, the longer the pressure.  In short, AGCS precalculated that breaching the insurance contract would most likely be more economically beneficial than honoring the promise of indemnity it made to the plaintiff. In the case at hand, AGCS's claim handling system leveraged its financial position, its bargaining power, and its litigation capacity to profit by denying plaintiff's claim without regard to the claim's merits.

---

[99] The time lag between taking in premiums and paying out claims (the "float") and the income earned in that time is a major source of insurance company profit; in 2007, industry investment totaled $58 billion.  As Warren Buffett, whose Berkshire Hathaway owns GEICO and other insurance companies, has said, float is the great thing about the insurance business, because it is "money we hold that is not ours but which we get to invest."

[100] Feinman, at 35.

[101] Feinman, at 43 (*citing* John N. Elllison, Timothy P. Law, and Luke E. Debevec, "Bad Faith and Punitive Damages: The Policyholder's Guide to Bad Faith Insurance Coverage Litigation," in *Environmental Insurance: Emerging Issues and Latest Developments on the New Coverage and insurance Cost Recovery* (Philadelphia: ALI-ABA, 2008), 159.

## Count 3 – Deceptive Insurance Practices

50.   Defendant AGCS failed to explain to plaintiff the reasons for AGCS's offer of an inadequate settlement.  AGCS failed to offer plaintiff adequate compensation without adequate explanation of the basis in the policy for its decision to make less than full payment.  Furthermore, AGCS did not communicate that any future settlements or payments would be forthcoming to pay for the entire losses covered under the policy, nor did they provide any explanation for the failure to adequately settle plaintiff's claim.

51.   AGCS failed to affirm or deny coverage of plaintiff's claim within a reasonable time.  Specifically, plaintiff did not receive timely indication of acceptance or rejection, regarding the full and entire claim, in writing from AGCS.

52.   AGCS refused to fully compensate plaintiff under the terms of the policy, even though AGCS failed to conduct a reasonable investigation.  AGCS performed an outcome-oriented investigation of the plaintiff's claim which resulted in a biased, unfair and inadequate evaluation of plaintiff's losses on the property.

53.   AGCS failed to meet its obligations under the Texas Insurance Code regarding its duties to timely acknowledge plaintiff's claim, begin an investigation of plaintiff's claim, and request all information reasonably necessary to investigate plaintiff's claim within the statutorily mandated time of receiving notice of plaintiff's claim.

54.   AGCS failed to accept or deny plaintiff's full and entire claim within the statutorily mandated time of receiving all necessary information.   In addition, AGCS

failed to communicate with plaintiff to ensure that plaintiff understood the coverage denials plaintiff received.

55.    Defendant's acts or practices violated:

a.    Texas Insurance Code chapter 541, subchapter B.

(1)    Misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue.  TEX. INS. CODE §541.060(a)(1).

(2)    Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability becomes reasonably clear.  TEX. INS. CODE §541.060(a)(2)(A).

(3)    Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim.  TEX. INS. CODE §541.060(a)(3).

(4)    Not affirming or denying coverage within a reasonable time.  TEX. INS. CODE §541.060(a)(4)(A).

(5)    Refusing to pay a claim without conducting a reasonable investigation.  TEX. INS. CODE §541.060(a)(7).

(6)    Making an untrue statement of material fact.  TEX. INS. CODE §541.061(1).

(7)    Leaving out a material fact, so that other statements are rendered

misleading.  TEX. INS. CODE §541.061(2).

b.    Texas Deceptive Trade Practices Act §17.46(b).

(1)    Representing that an agreement confers or involves rights, remedies, or

obligations that it does not, or that are prohibited by law.  TEX. BUS. & COM. CODE

§17.46(b)(12).

c.    Texas Insurance Code Chapter 541.151.

56.    Defendant's acts and practices were a producing cause of injury to plaintiff

which resulted in the following damages:

a.    actual damages; and

b.    insurance policy proceeds.

57.    Plaintiff seeks damages within the jurisdictional limits of this Court.

58.    <u>Additional damages.</u>  Defendant acted knowingly, which entitles plaintiff to

recover treble damages under Texas Insurance Code section 541.152(b).

59.    <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable and necessary attorney

fees under Texas Insurance Code section 541.152(a)(1).

### COUNT 4 - LATE PAYMENT OF CLAIMS

60.    Plaintiff is an insured under a contract for homeowner's insurance issued by

defendant.

61.    Defendant AGCS is an insurance carrier doing business in the State of Texas.

62.     Plaintiff suffered a loss covered by the policy and gave proper notice to AGCS of plaintiff's claim.

63.     AGCS is liable for the claim and had a duty to pay the claim in a timely manner.

64.     Defendant breached its duty to pay plaintiff's claim in a timely manner by not timely:

      a.     acknowledging the claim;

      b.     investigating the claim;

      c.     requesting information about the claim;

      d.     paying the claim after wrongfully rejecting it; and

      e.     paying the claim after accepting it.

65.     AGCS's breach of duty caused injury to plaintiff, which resulted in the following damages:

      a.     mental anguish damages;

      b.     policy proceeds;

      c.     prejudgment interest

66.     <u>Statutory damages.</u>  Plaintiff is entitled to recover actual damages in the amount of the claim, and under Texas Insurance Code section 542.060(a), statutory damages of 18% of the amount of the claim.

67.     <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Insurance Code section 542.060(b).

## COUNT 5 – COMMON LAW FRAUD

68.   The Fifth Circuit has recognized duties to disclose absent a fiduciary relationship.   The Fifth Circuit has recognized a duty to speak in negligent misrepresentation cases when "(1) a confidential or fiduciary relationship exists between the parties; or (2) one learns later that his previous statement was false and misleading; or (3) one party knows that the other party is relying on a concealed fact and does not have an equal opportunity to discover the truth; or (4) one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, i.e., all material facts, lest his partial disclosure convey a false impression.[102]

69.   AGCS failed to properly underwrite the risk, failed to perform a proper underwriting inspection of the risk, failed to calculate the correct premium that would cover any anticipated losses, and failed to disclose these facts to plaintiff.   When AGCS sold the insurance policy to plaintiff, AGCS intended to allocate the non-administrative expense portions of the insurance premium to profit, and thus failed to properly calculate the portion of the premium that would be reserved to pay any anticipated claims.   In other words, when AGCS sold the policy to plaintiff, AGCS never intended to pay a claim the size of plaintiff's current claim, even though proper underwriting would have led AGCS to anticipate and prepare to pay a claim of that size.

---

[102] *Lewis v. Bank of Am.*, 347 F.3d 587, 588 (5th Cir. 2003) (citing *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001)).

70.   AGCS could not provide its insurance services unless it was able to make a legitimate profit sufficient to allow it to remain solvent and provide a reasonable return to its shareholders.[103]  The premium that AGCS required plaintiff to pay for the insurance policy was calculated to allow AGCS to accomplish those goals.

71.   AGCS charges its policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.[104]  Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for AGCS's profit.[105]  In addition, AGCS's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.[106]

72.   AGCS made the material representation to plaintiff that AGCS would pay the full cost of casualty losses, less the policy deductible, that plaintiff suffered in a covered event.  This representation was false.  When AGCS made this representation, AGCS either knew the representation was false, or AGCS made the representation recklessly, as a

---

[103] *See* Berardinelli, at 36.
[104] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.
[105] *See* Berardinelli, at 19.
[106] *Id.*

positive assertion, and without knowledge of its truth.  AGCS made this representation

with the intent that the plaintiff act on it.  AGCS knew that the plaintiff was seeking peace

of mind, and AGCS made the representation knowing that plaintiff would act on it.  The

plaintiff purchased the policy and paid all premiums in reliance on the representation

and with the expectation that AGCS would keep its promise.  The representation caused

injury to plaintiff.

73.    AGCS's fraudulent actions caused injury to plaintiff, which resulted in the

following damages:

      a.    actual damages;

      b.    exemplary damages; and

      c.    prejudgment interest

### COUNT 6 – FRAUD BY NONDISCLOSURE

74.    Plaintiff incorporates the factual allegations included in Count 5.

75.    AGCS's claim handling system would govern any claim filed by plaintiff under

the policy.  As previously described, the purpose of AGCS's claim handling program was

to increase corporate profits at plaintiff's expense should plaintiff ever file a claim under

the policy.  AGCS concealed this fact from plaintiff and failed to disclose the facts about

its claim handling system to plaintiff.  Because the operation of defendant's claim

handling system directly contradicted the promises that AGCS made to the plaintiff,

AGCS had a duty to disclose these material facts to plaintiff.  The defendant knew the

plaintiff was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover the facts. AGCS was deliberately silent when it had a duty to speak. By failing to disclose the facts, the defendant intended to induce the plaintiff to purchase the insurance policy. Plaintiff purchased the policy and thus relied on AGCS's nondisclosure. Plaintiff was injured because of acting without the knowledge of the undisclosed facts.

76. AGCS's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

     a.    actual damages;

     b.    exemplary damages; and

     c.    prejudgment interest

**THE WHO, WHAT, WHEN, AND WHERE**

77. In support of the elements of common law fraud and fraudulent nondisclosure, plaintiff presents the following:

     a.   **THE WHO:**   AGCS Underwriters who underwrote plaintiff's policy.

     b.   **THE WHAT:**   AGCS would pay covered losses when it sold the insurance policy to plaintiff.

                            Second Misrepresentation – AGCS had taken necessary underwriting steps to ensure that it could pay claims that arose under the policy.

     c.   **THE WHEN:**   The date on which PIIC sold the policy covering the date of loss to plaintiff.

  d. **THE WHERE:** Garland, Texas

78. Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

79. <u>Attorney Fees.</u> Plaintiff is entitled to recover reasonable attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this suit is for breach of a written contract.  Plaintiff retained counsel, who presented plaintiff's claim to AGCS. AGCS did not tender the amount owed within 30 days of when the claim was presented.

## JURY DEMAND

80. Plaintiff respectfully requests a trial by jury.

## CONDITIONS PRECEDENT

81. All conditions precedent to plaintiff's claim for relief have been performed or have occurred.

## PRAYER

82. For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

  a. Actual damages.

  b. Prejudgment and postjudgment interest.

  c. Court costs.

  d. Attorneys' fees.

  e. Exemplary damages.

  f. All other relief to which plaintiff is entitled.

Respectfully submitted,

Scott Law Offices, P.C.
The Jones Building
708 Main Street
Houston, Texas 77002
Telephone: (713) 941-9309
Facsimile: (844) 270-0740


*/s/Danny Ray Scott*
_____
Danny Ray Scott
State Bar No. 24010920
casenotifications@scottlawyers.com

*Attorneys for Plaintiff*